UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,                       :
                                                :
             v.                                 :        **MEMORANDUM & ORDER**
                                                :        17-CR-672 (WFK)
DONALD KNOWLES,                                 :
                                                :
                       Defendant.               :
------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On August 16, 2018, Donald Knowles pled guilty to the sole count of the Indictment. The Court now sentences him and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress and the President and contained in 18 U.S.C. § 3553(a). For the reasons discussed below, Donald Knowles is hereby sentenced to 60 months of incarceration, 3 years of supervised release, criminal forfeiture as set forth in the Order of Forfeiture, and a $100.00 special assessment.

## BACKGROUND

On December 5, 2017, the Government filed a one-count Indictment charging Donald

Knowles ("Defendant") with being a Felon in Possession of a Firearm in violation of 18 U.S.C. §

922(g)(1). Indictment ¶ 1, ECF No. 7. The Indictment also included a criminal forfeiture

allegation that would require Defendant to forfeit any firearm or ammunition involved in the

commission of his crime. *Id.* ¶ 2. On August 16, 2018, Defendant pled guilty to the sole count

of the Indictment pursuant to a plea penalty sheet. *See* Aug. 16, 2018 Minute Entry, ECF No. 30.

The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence

using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

### I.    Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case. If and

when a district court chooses to impose a sentence outside of the Sentencing Guidelines range,

the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form[.]" *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.). Section 3553(a) provides a set of seven factors for the Court to consider in determining what sentence to impose on a criminal defendant. The Court addresses each in turn.

## II.    Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Defendant was born on February 17, 1981 in Brooklyn, New York. Revised Presentence Investigation Report ("PSR") ¶ 32, ECF No. 37.[1] Defendant's mother, Yvonne Knowles, resides in Middletown, New York, and works as a home health aide. *Id.* Defendant reports he never met his biological father and is unaware of his identity. *Id.* Defendant advised his mother began a romantic relationship with Mr. Vincent Hall when Defendant was approximately seven years old, and Defendant describes Mr. Hall as his father, noting they shared a close bond. *Id.* Despite

---

[1] Probation filed a Revised Presentence Investigation Report on February 15, 2019 resolving an objection raised by Defendant and attaching an addendum that responded to another objection raised by Defendant. *See* PSR; Addendum to the Presentence Investigation Report, ECF No. 38.

a positive relationship, Mr. Hall was frequently away from home during Defendant's childhood as he worked as a longshoreman. *Id.* ¶ 34. Mr. Hall passed away in July 2018 due to complications of diabetes. *Id.* ¶ 32. Defendant has two biological brothers and two maternal half-sisters. *Id.* ¶ 33.

Defendant was raised in Brooklyn, New York. *Id.* ¶ 34. Defendant reported he and his siblings were displaced from their home after it was destroyed by a fire when he was approximately six or seven years old. *Id.* Defendant and his mother and siblings thereafter lived in the third floor of a home owned and occupied by Defendant's maternal grandmother. *Id.* Defendant reported the family also resided in shelters for several months before settling into an apartment in Brooklyn, and over the next several years, in various apartments located in the Louis Pink Houses—a low-income housing complex. *Id.* Defendant recalled living in a violent setting throughout his childhood, resulting in exposure to violence, illegal drugs, shootings, and poverty. *Id.* Defendant was reportedly hospitalized for several weeks at age 13 due to depression, and he struggled in school due to attention/hyperactivity issues. *Id.*

Defendant advised his mother "did the best she could" to maintain a stable, supportive home environment and sometimes worked outside the home as a cook. *Id.* During a telephonic interview, his mother confirmed Defendant was raised in the "projects" after the home fire. *Id.* Defendant's mother reported he suffered a serious head injury while performing a breakdancing stunt at school when he was thirteen years old, and was "never the same again." *Id.* Defendant's behavior began to spiral, and his mother filed a person in need of supervision ("PINS") petition with a local family court, and Defendant was removed temporarily from her home. *Id.* Although Defendant's mother reported his behavior improved after the PINS placement, he was placed in custody at age 15 for a serious offense, discussed in further detail *infra*. *Id.*

In 2013 after being released from prison, Defendant briefly resided in Troy, New York, before returning to Brooklyn. *Id.* ¶ 35. In 2014, Defendant moved to Rock Hill, South Carolina, with his mother and Mr. Hall, but returned two years later when Mr. Hall became ill. *Id.* For several months prior to his 2017 arrest in connection with the instant offense, Defendant resided with a girlfriend in Brooklyn. *Id.* Their romantic relationship has since ended. *Id.*

Defendant has fathered at least four children with three different women. *Id.* ¶ 36. Defendant reported when he was not in custody, he provided financial support to the mothers of his children when they requested. *Id.* Defendant stated he wanted to maintain close bonds with all of his children going forward. *Id.*; *see also* Def. Sentencing Mem. ("Def. Mem.") at 9-10, ECF No. 39.

In approximately 2008, Defendant commenced a romantic relationship with Shanae Kitching, now age 34, which produced one son. PSR ¶ 37. Defendant and Ms. Kitching were married on December 4, 2009 while Defendant was incarcerated and, following his release from prison, divorced on July 18, 2014. *Id.* Defendant reported he is "not on great terms" with his former wife, who resides in Delaware. *Id.*

Defendant fathered another child in 2008 with Jennifer Thomas, now age 37. *Id.* ¶ 38. Defendant and Ms. Thomas lived together for approximately one year before Defendant moved to South Carolina in 2014. *Id.* Their child attends private school and resides with her mother. *Id.* According to his criminal history report, Defendant was the subject of two temporary protection orders in 2014, entered on behalf of Ms. Thomas and their daughter. *Id.* Their child provided an email in support of Defendant in the instant case, in which she writes, "[E]ven though he's in federal prison[,] the caring never stops[.] [E]very day he text[s] me good morning and good night[.] [H]e also says he loves me very much." Def. Mem., Ex. D at 7.

According to the New York City Clerk's Office, on December 18, 2014, Defendant married Nicola Candy Rattigan, age 32. PSR ¶ 42. Defendant made no mention of Ms. Rattigan during the presentence interview, and it is unclear if their marriage remains intact. *Id.* Defendant's mother stated she has never heard of Ms. Rattigan. *Id.*

In 2015, Defendant fathered twins with Shawn Withall, who currently resides in Charlotte, North Carolina with the children. *Id.* ¶ 39. Ms. Withall advised during a telephonic interview Defendant is an "awesome father," and while she never obtained a formal child support order, she is hopeful he will return to the Charlotte area following his release from custody. *Id.* Ms. Withall also believes Defendant is a compassionate and caring person, although she reported having no knowledge of his criminal history or the instant offense. *Id.*

Defendant advised he was contacted in 2017 via Facebook by Ms. Tisha McKenzie who reportedly claimed Defendant is the father of her two-year-old daughter. *Id.* ¶ 40. Defendant could not confirm the veracity of her claim as his paternity has not been established. *Id.*

Defendant has been in a romantic relationship with Noellee Channer, age 26, for the past two years and recently became engaged. *Id.* ¶ 41. They have no children together, but Ms. Channer has three children from previous relationships, who Ms. Channer reported were all fond of Defendant. *Id.* Ms. Channer also advised she is hopeful they will marry prior to his sentencing. *Id.* Ms. Channer is currently unemployed but has a potential employment opportunity as a nursing assistant. *Id.* She described Defendant very positively, noting he is very supportive of his children and he assists her financially to the extent he has been able. *Id.*

Upon Defendant's release from custody, his mother confirmed she will permit Defendant to reside with her, and Defendant "will do the right thing" upon his release from custody. *Id.* ¶

43. Notably, Defendant has not incurred any disciplinary sanctions while detained in connection with the instant offense, according to the Bureau of Prisons database. *Id.* ¶ 44.

At his presentence interview on November 8, 2018, Defendant reported he recently developed a lump under his left armpit, causing him severe pain. *Id.* ¶ 46. Results of an x-ray he underwent were still pending as of the interview. *Id.* Medical records from the Metropolitan Detention Center ("MDC") reflect Defendant was sent to a local hospital in December 2017 for nausea and vomiting, but Defendant's medical records contain no further information regarding this incident. *Id.* ¶ 48. Defendant advises he was told he is "borderline diabetic" and was prescribed an unspecified medication, which he stopped taking after a short period of time. *Id.* In November 2017, according to MDC records, Defendant experienced right knee pain; he reportedly underwent total knee replacement in 2007 after being stabbed. *Id.* MDC records also indicate Defendant has a history of hypertension, causing shortness of breath. *Id.*

Defendant was reportedly assaulted in November 2013 at a jail in Troy, New York. *Id.* ¶ 47. As a result, he sustained a left mandible (jaw) fracture, and a metal plate and screws were surgically installed in his mouth at Albany Medical Center in Albany, New York. *Id.* Defendant did not seek further treatment even though he regularly experienced jaw pain and headaches. *Id.* MDC records also reflect Defendant complained of oral pain and an inability to open his mouth fully in December 2017. *Id.* He was given pain medication (ibuprofen) and an antibiotic (amoxycillin). *Id.*

On February 1, 2018, Defendant underwent surgery to remove the hardware from his mouth at Kings Jewish Medical Center in Brooklyn, New York. *Id.* Medical records reflect a tooth and some, but not all, of the hardware could be removed because the oral screws were "misplaced" during the original surgery. *Id.*; *see also* Def. Mem. at 7-8. Defendant was

informed it may be impossible to extract fully the plate from his jaw due to a recurrent abscess, and as a result, Defendant's prognosis is unclear. PSR ¶ 47.

At approximately age 12, Defendant advised he was hospitalized for several weeks following a "nervous breakdown." *Id.* ¶ 49. His mother reported Defendant received counseling as a child after hospitalization, and she had him admitted at Kings County Hospital because of explosive anger. *Id.* No records of this hospitalization could be obtained. *Id.* Defendant was thereafter diagnosed with attention deficit hyperactivity disorder and prescribed an unidentified medication. *Id.* In addition to relocating to the "projects," he became extremely emotional when he learned his brother was under investigation in connection with a murder. *Id.*

As an adult, Defendant has continued to suffer from depression but has not sought treatment until his incarceration in connection with the instant offense. *Id.* MDC records reflect Defendant requested to see a psychiatrist in December 2017, although it does not appear his request was granted. *Id.* Defendant would like to participate in counseling to help him come to terms with his childhood and to help him become a "better person" in the future. *Id.* His mother agreed Defendant needs to take part in counseling to address his anger issues; neither Ms. Withall nor Ms. Channer expressed concerns regarding Defendant's mental or emotional health. *Id.*

Defendant advised he began using marijuana and consuming alcohol regularly with friends at approximately age 15. *Id.* ¶ 50. His marijuana and alcohol consumption briefly ended after he was placed at a juvenile detention facility. *Id.* After Defendant's release from imprisonment as an adult, he reportedly used marijuana once every few months. *Id.* He advised he used "Ecstasy" and alcohol to cope with his sadness, and his alcohol consumption was a daily occurrence when using Ecstasy. *Id.* ¶¶ 49-50. Defendant advised from 2013 until his arrest in

2017, he used Ecstasy multiple times per day, and he paid for pills from money he earned from "off the books" employment. *Id.* ¶ 50. Defendant now believes his use of those substances was problematic, masking his sadness and anger, and hindering his ability to make responsible decisions. *Id.*

Defendant was in eighth grade at Intermediate School 57 in Brooklyn, New York, when he was first incarcerated in 1996. *Id.* ¶ 53. He advised he never returned to a formal school setting. *Id.* While incarcerated, Defendant attended adult basic education classes and reportedly obtained vocational training in building maintenance, electrician work, carpentry, and food preparation. *Id.* ¶¶ 53-54.

Defendant was previously in custody for the majority of 1996 to 2006 and 2009 to 2013, and he has been in custody since November 22, 2017. *Id.* ¶ 55. He has never held any verifiable employment and has previously worked as a freelance barber, fitness trainer, and cook. *Id.* When not incarcerated, he collected $733 in monthly Supplemental Security Income. *Id.* Probation notes, based on Defendant's financial condition, he appears unable to pay a fine. *Id.* ¶ 58.

Defendant was arrested when he was fifteen years old after seriously injuring another person with a boxcutter. *Id.* ¶ 35. On January 21, 1997, he was convicted of several charges, including attempted murder, and was incarcerated until age 22. *Id.* ¶¶ 5, 35. He then returned to custody twice following parole violations. *Id.* ¶ 35. On March 15, 2010, he was convicted of attempted robbery and sentenced to two to four years imprisonment. *Id.* ¶¶ 5, 23.

Regarding the instant offense, the New York City Police Department ("NYPD") received a report alleging Defendant threatened and struck a woman in the head with a firearm on November 14, 2017. *Id.* ¶ 3. On November 22, 2017, NYPD detectives sought to locate

Defendant and place him under arrest for the alleged November 14 assault. *Id.* When the detectives located and approached Defendant, he ran inside a building in the Louis Pink Houses, a New York City Housing Authority complex. *Id.* The detectives ultimately caught up to him on the second floor and placed him under arrest. *Id.* They found a loaded 10-millimeter semiautomatic Colt firearm in the lobby of the building, and surveillance footage revealed the firearm fell from Defendant's person when he entered the building. *Id.* It is unknown whether the firearm alleged to have been used in the November 14 assault is the same firearm Defendant possessed on November 22. *Id.* ¶ 3. Defendant told police he obtained the firearm after he observed an interaction that escalated between individuals he had "issues with" and his friends. *Id.* ¶ 4. Defendant described the circumstances as a "heated situation." *Id.* Because Defendant had prior felony convictions, it was unlawful for him to possess a firearm at the time of his arrest. *Id.* ¶ 5.

### B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Defendant's possession of a loaded handgun in a public place endangered the community. Defendant stated to the police following his arrest that he could have used the gun, and that it was in his heart to do it, even though it wasn't really his intention. *See* PSR ¶ 4. Defendant's previous felony convictions for attempted murder and attempted robbery reflect

9

Defendant's willingness to turn to violence to resolve conflict. The Court's sentence recognizes the seriousness of Defendant's offense and punishes Defendant accordingly. It seeks to deter Defendant from further criminal activity, from turning to violence to solve his disputes, and from possessing dangerous firearms in the future. More generally, the Court's sentence sends a message to other convicted felons that a life of crime carries a risk of punishment that outweighs any potential gains. Finally, it also considers Defendant's family support and his medical condition.

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to the sole count of the indictment, which charged Defendant with being a Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). *See* Aug. 16, 2018 Minute Entry. By statute, Defendant faces a maximum term of imprisonment of ten years. *See* 18 U.S.C. § 924(a)(2) ("Whoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both.").

Defendant also faces a maximum term of supervised release of three years, *id.* § 3583(b)(2); a maximum fine of $250,000.00, *id.* § 3571(b); forfeiture of any firearm or ammunition involved in the commission of the crime, *id.* § 924(d); and a special assessment of $100.00, *id.* § 3013. Defendant is statutorily eligible for between one and five years probation because the sole count to which he pleaded guilty is a Class C felony. *Id.* § 3561(c)(1). Defendant has already consented to forfeiture of the firearms involved in the commission of his crime.

**D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" *Id.* § 3553(a)(4)(A).

The parties dispute the applicable Guidelines calculations. Specifically, defense counsel argues Guideline § 2K2.1(a)(4) applies because Defendant's prior conviction for attempted robbery is not a "crime of violence" under existing law. *See* Feb. 11, 2019 Obj. Letter to Probation Report ("Obj. Letter"), ECF No. 36. Probation and the Government, however, contend Guideline § 2K2.1(a)(2) applies because Defendant has two felony convictions that qualify as a crime of violence under existing law. *See* PSR ¶ 10; Gov't Sentencing Mem. ("Gov't Mem.") at 2, ECF No. 40. The Court considers each argument in turn.

The appropriate Guideline for violations of 18 U.S.C. § 922(g)(1) is Guideline § 2K2.1, which applies to unlawful receipt, possession, or transportation of firearms or ammunition and prohibited transactions involving firearms or ammunition generally. *See* United States Sentencing Commission, Guidelines Manual ("USSG") § 2K2.1 (2018). Guideline § 2K2.1 instructs the Court to apply Guideline § 4B1.2(a) when considering a "crime of violence" as part of its Guidelines calculus. Guideline § 4B1.2(a) defines a "crime of violence" as:

> [A]ny offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>> (1) Has an element the use, attempted use, or threatened use of physical force against the person of another, or
>> (2) Is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm . . . .

USSG § 4B1.2(a); *see* Application Note 1 to USSG § 2K2.1. Application Note 1 to Section 4B1.2(a) further notes "crime of violence" includes the offenses of attempting to commit such offenses.

Probation argues Guideline § 2K2.1(a)(2), which results in a base offense level of 24, applies to this case because Defendant has two prior convictions for crimes of violence; specifically, Defendant's 1997 conviction for Attempted Murder in the Second Degree and a 2008 arrest and later conviction for Attempted Robbery in the Third Degree. PSR ¶¶ 10, 21, 23. Probation accordingly reaches a base offense level of 24 for Defendant and a total offense level of 21 after reductions for acceptance of responsibility. *Id.* ¶¶ 17-18. The Government agrees with Probation's Guidelines calculations. Gov't Mem. at 2.

Defense counsel asks the Court to apply Guideline § 2K2.1(a)(4), resulting in a base offense level of 20, because Defendant "committed the initial offense subsequent to sustaining one felony conviction of . . . a crime of violence[.]" Obj. Letter at 2. Defense counsel argues Defendant's state conviction for Attempted Robbery in the Third Degree should not be classified as a crime of violence under USSG § 4B1.2(a). *Id.* Defense counsel contends the instant case is distinguishable from *United States v. Pereira-Gomez*, 903 F.3d 155 (2d Cir. 2018), in which the Second Circuit concluded attempted robbery in the second degree in New York constitutes a crime violence pursuant to Section 2L1.2 of the November 2014 Guidelines. Obj. Letter at 4. According to the defense, "th[at] holding was limited to the application of the 2014 Guidelines and the correlation of the application notes to Section 2L1.2 for the crime of illegal re-entry into the United States." *Id.*

Defense counsel points in its objection letter to the then-pending decision in *Stokeling v. United States*, 139 S. Ct. 544 (2019). Obj. Letter at 2. According to defense counsel, in that

case, the Supreme Court "review[ed] a Florida statute which defines a minimal level of force as robbery in an identical manner as the New York robbery case law." *Id.* In *Stokeling*, the Supreme Court determined "the term 'physical force' in the [Armed Career Criminals Act ("ACCA")] encompasses the degree of force necessary to commit common-law robbery"—"the amount of force necessary to overcome a victim's resistance." 139 S. Ct. at 555. The same month the Supreme Court decided *Stokeling*, the Second Circuit held "the New York offense of attempted robbery in the third degree is a 'violent felony' under the ACCA." *United States v. Thrower*, 914 F.3d 770, 776-77 (2d Cir. 2019) (per curiam); *see also United States v. Moore*, 916 F.3d 231, 240-41 (2d Cir. 2019) (concluding third-degree robbery in New York "constitute[s] a crime of violence under the force clause of the Career Offender Guidelines because they include 'as an element the use, attempted use, or threatened use of physical force against the person of another.'" (quoting USSG § 4B1.2(a)(1))); *Boone v. United States*, 750 F. App'x 64, 65 (2d Cir. Feb. 7, 2019) (summary order) (concluding *Stokeling*, *Pereira-Gomez*, and *Thrower* foreclosed the argument that attempted second-degree robbery in New York does not qualify as a "violent felony"); *United States v. Johnson*, 17-CR-3329, 2019 WL 625995, at *3 (2d Cir. Feb. 14, 2019) (summary order) ("Johnson's argu[ment] that his prior New York conviction for attempted third-degree robbery . . . does not qualify as a predicate offense under the ACCA . . . is squarely foreclosed by our recent decision in *United States v. Thrower*[.]").

In his pre-sentence submission to the Court, Defendant appears to concede *Stokeling* and its early progeny in effect foreclose his argument. Indeed, according to defense counsel, the decision in *Pereira-Gomez* "would appear to have sustained the view, at the present time, that New York State robbery convictions are crimes of violence under the force clause. Likewise, [*Stokeling*] . . . sustains the Second Circuit view that all robberies constitute a crime of violence

under the force clause." Def. Mem. at 1. Defendant does not, however, explicitly withdraw his objection to the base offense level calculation.

Despite disagreements regarding the base offense level calculation, Defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels pursuant to Guideline § 3E1.1(a). *See* PSR ¶ 17; Gov't Mem. at 2. Because the Government was notified in a timely manner of Defendant's intention to enter a plea of guilty, the offense level is decreased by one additional level. USSG § 3E1.1(b); PSR ¶ 18.

Defendant's past criminal convictions, described *supra*, yield a criminal history score of seven, establishing a criminal history category of IV. USSG Ch. 5, Part A. Defendant's convictions for Attempted Murder in the Second Degree in Kings County Supreme Court and for Attempted Robbery in the Third Degree in Kings County Supreme Court contribute three criminal history points each. PSR ¶¶ 21, 23. Defendant's conviction for Criminal Possession of Marijuana in the Fifth Degree yielded an additional criminal history point, rendering Defendant's total criminal history score seven. *See id.* ¶¶ 25-26.

The Government suggests Defendant should receive a sentence at the low end of the 57 to 71 months advisory Guidelines range, noting Defendant's "time while incarcerated will likely be especially difficult because of his [persistent] pain." Gov't Mem. at 5. Probation suggests Defendant should receive a sentence of 68 months custody. Probation Sentencing Recommendation at 1, ECF No. 33-1. Defense counsel requests a sentence of 36 months custody with appropriate drug treatment and counseling, including his possible admission into the in-patient drug and counseling program ("RDAP") offered by the Bureau of Prisons. Def. Mem. at 2, 11.

The Court finds the appropriate total offense level is 21, which, with a criminal history

category of IV, yields a Guidelines suggested term of imprisonment of between 57 and 71

months. USSG Ch. 5, Part A. Under the Guidelines, the Court may also sentence Defendant to a

term of supervised release of one to three years, *id.* § 5D1.2(a)(2), and impose a fine of between

$15,000.00 and $150,000.00, *id.* § 5E1.2(c)(3). The Guidelines further suggest Defendant is

ineligible for probation. *Id.* § 5B1.1, n.2. Probation notes there is no evidence Defendant has the

ability to pay a fine. PSR ¶ 58; Probation Sentencing Recommendation at 3.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy

statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). Neither the

Government nor Probation identified any relevant policy statements in this case, but Probation

noted Defendant's upbringing in a high-crime environment after a fire destroyed his family's

home, mental health issues, and educational struggles from an early age may warrant a sentence

outside the advisory guideline system. PSR ¶ 73; *see also* Gov't Mem. at 5. In its

recommendation, however, Probation argued the circumstances in this case do not justify a

sentence below the guideline range. Probation Sentencing Recommendation at 3. Probation

instead argues the circumstances warrant a sentence closer to the upper end of the guidelines

range. *Id.*

Defendant requests a below-Guidelines sentence pursuant to Section 4A1.3(b)(1),

arguing the Guidelines calculation of his criminal history category overstates his criminal

history. Def. Mem. at 2. He also requests a below-Guidelines sentence pursuant to Policy

Statement § 5H1.4, arguing he suffers from an extraordinary physical impairment. *Id.* Each

argument is addressed presently.

1. Guidelines § 4A1.3

Guideline § 4A1.3(b)(1) provides:

> If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

USSG § 4A1.3(b)(1). The Second Circuit has also called this a "horizontal departure," where a district court would move horizontally across the Sentencing Table to depart and determine a different sentencing range. *United States v. Mishoe*, 241 F.3d 214, 217 (2d Cir. 2001).

Horizontal departures under Guideline § 4A1.3(b) "can only be based on 'individualized consideration of the circumstances of a defendant's case.'" *United States v. Ingram*, 721 F.3d 35, 39 (2d Cir. 2013) (Calabresi, J., concurring) (quoting *Mishoe*, 241 F.3d at 218). Should a district court depart from the applicable criminal history category, the court must state in writing "the specific reasons why the applicable criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." USSG § 4A1.3(c)(2).

Defendant identifies two aspects of his criminal history that he argues warrant a sentence consistent with a lower criminal history category. Def. Mem. at 3-6. First, Defendant references his age at the time of his 1997 convictions for attempted murder and assault, which were imposed concurrently for a singular incident occurring on September 13, 1996. *Id.* at 3. At the time of the incident and of his arrest, Defendant was fifteen years old, and he had previously been hospitalized for psychological issues in Kings County. *Id.* Defendant argues "the Guidelines recognized that age and

16

psychological factors are offender characteristics which provide a basis for consideration for a downward departure." *Id.* In light of Defendant's age and mental state at the time of his 1996 arrest, Defendant urges Sections 5H1.1 (age) and 5H1.3 (mental and emotional conditions) are applicable.[2] Moreover, Defendant points to New York State legislation enacted in 2017 raising the age of criminal responsibility from sixteen years of age to eighteen as evidence of the "harsh realities of the adult criminal justice system on its children." *Id.* at 4. Defendant also notes he "was released on May 13, 2003 on his 1997 conviction, which places him less than six months from the 15 year exclusion which would preclude <u>any</u> criminal history points being assigned to this conviction." *Id.*

Second, Defendant argues the Court should "horizontally adjust" Defendant's criminal history in light of his 2014 conviction for marijuana possession. *Id.* at 5. Defendant stresses he would not have been arrested if he committed this offense in 2018 "given the present policy of the New York City Police Department" not to arrest individuals for possession of marijuana. *Id.* at 5-6. This criminal history point would not be attributable to Defendant if he committed the offense in 2018. *Id.* at 6. Defense counsel also points to a September 2018 policy pronouncement by the Brooklyn District Attorney that the District Attorney's Office would consent to the expungement of convictions for low-level marijuana offenses. *Id.* Because a single-point reduction

---

[2] USSG § 5H1.1 provides in relevant part: "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.3 provides in relevant part: "[M]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

places Defendant in a lower Criminal History Category, defense counsel submits

Category II or III is a more accurate reflection of Defendant's criminal history. *Id.*

In response, the Government argues criminal history category IV "does not

'substantially over-represent[] the seriousness' of his past criminal conduct." Gov't

Mem. at 4 (quoting USSG § 4A1.3(b)(1)). The Government stresses Defendant has

committed two serious prior acts of violence and "is a recidivist several times over." *Id.*

The Government further argues the mere fact Defendant's 2014 conviction for marijuana

possession is treated differently today does not alter Defendant's unlawful conduct at the

time, reflective of his "intentional defiance of the law." *Id.*

This Court concludes a downward departure is not warranted because the Court

concludes a Criminal History Category IV accurately reflects, and does not overstate,

Defendant's criminal history.

### 2. Guidelines § 5H1.4

Defense counsel also argues a downward departure is appropriate in this case pursuant to

Policy Statement § 5H1.4, which provides:

> Physical condition or appearance, including physique, may be relevant in determining
> whether a departure is warranted, if the condition or appearance, individually or in
> combination with other offender characteristics, is present to an unusual degree and
> distinguishes the case from the typical cases covered by the guidelines. An extraordinary
> physical impairment may be a reason to depart downward . . . .

USSG § 5H1.4; *see* Def. Mem. at 6.

"Physical condition is not ordinarily relevant to determining whether [a] defendant

should receive a departure from the applicable guideline range." *United States v. Rioux*, 97 F.3d

648, 663 (2d Cir. 1996) (citing USSG § 5H1.4). However, "a departure is permitted for a

physical impairment where such a factor is present 'to an exceptional degree.'" *United States v. Jimenez*, 212 F. Supp. 2d 214, 216 (S.D.N.Y. 2002) (Lynch, J.) (quoting *Koon v. United States*, 518 U.S. 81, 95-96 (1996)). If a court determines a departure is appropriate because the defendant has an "extraordinary physical impairment," the impairment must be one that renders the defendant "seriously infirm." *Compare id.* at 219 (finding the defendant's condition, including "Amnestic Disorder and psychotic hallucinations consequent on brain aneurism" warranted departure, especially given her "condition serious erodes her capacity to threaten society"), *with United States v. Marcano*, 74 F. App'x 108, 109-10 (2d Cir. 2003) (summary order) (affirming district court's refusal to depart downward pursuant to USSG § 5H1.4 despite the defendant's "constant numbness, extreme shooting pain, muscle loss, and the ability to stand, all in his right leg" resulting from old gunshot wounds).

The Court provides an account of Defendant's oral surgery and medical history above. *See supra* Section II.A. Consistent with this account, defense counsel notes in his pre-sentence submission to the Court that Defendant sustained a left mandible fracture, with open reduction resulting in the installation of plates and screws, in 2013. Def. Mem. at 7. On February 2, 2018, Defendant received oral surgery where certain hardware was removed from the left side of his jaw and two teeth were extracted. *Id.* Despite the surgery, Defendant reports he still has chronic inflammation, headaches, and jaw pain, at one point sustaining an abscess in 2018. *Id.* at 7-8. According to a February 20, 2018 medical report by Dr. Daniel Kaufman, a plastic surgeon, Defendant's condition is the result of misplaced oral screws: "there is a distinct possibility of infection and malunion of the bone, with consequent possible destabilization of healed bone and consequent loss of integrity . . . . [F]ull and complete extraction of this plate may be IMPOSSIBLE." *Id.* at 8.

Defense counsel argues Defendant "suffers daily pain, swelling and recurrent infections due to the lower border plate remaining implanted in his jaw." *Id.* Because of Defendant's level of pain and infections, defense counsel requests a sentence "which recognizes this physical difficulty and provide[s] some measure of variance or departure which acknowledges the difficulty and pain associated with this medical condition." *Id.* at 9. Defense counsel also highlights Defendant's psychological history and Defendant's in-patient psychiatric care at Kings County Hospital due to Attention Deficit Hyperactive Disorder and hyperactivity. *Id.* Defense counsel reported attempts in vain to obtain the medical records from Kings County Hospital. *Id.* As a result of Defendant's medical conditions, described above, defense counsel argues Defendant maintains an "extraordinary physical impairment" warranting a below-Guidelines sentence pursuant to Section 5H1.4.

In response, the Government argues Defendant has not met the "high bar" for a downward departure pursuant to Section 5H1.4. Gov't Mem. at 4-5 (citing *Marcano*, 74 F. App'x at 109-10). Despite this, the Government "does recognize that his persistent pain, and the risk of future infections, could be considered under 18 U.S.C. § 3553(a), when determining, for example, the 'need for the sentence imposed,' given that his time while incarcerated will likely be especially difficult because of his pain." *Id.* at 5.

This Court concludes a downward departure is not warranted as the result of Defendant's physical condition.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For the reasons stated in this memorandum and order,

and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

## G. The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor, requiring the Court to touch upon "the need to provide restitution to any victims of the offense," 18 U.S.C. § 3553(a)(7), is not applicable in Defendant's case.

## CONCLUSION

A sentence of 60 months of incarceration, to be followed by 3 years of supervised release, criminal forfeiture as agreed, and a $100.00 special assessment is appropriate and comports with the dictates of § 3553. This sentence is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2).

The Court expressly adopts the factual findings of the Revised Presentence Investigation Report, barring any errors contained therein, and the addendum thereto. The Court imposes the special conditions of release proposed by the Probation Department.

SO ORDERED.

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: March 20, 2019
     Brooklyn, New York